## ALGONQUIN GAS TRANSMISSION CO. v. FEDERAL POWER COMMISSION.

No. 4703.

United States Court of Appeals
First Circuit.
Jan. 8, 1953.
Rehearing Denied Jan. 15, 1953.

Paul A. Porter, Washington, D. C. (Burns, Blake & Rich, Boston, Mass., and Arnold, Fortas & Porter, Washington, D. C., with him on the brief), for petitioner.

Bernard A. Foster, Jr., Assistant General Counsel, Washington, D. C. (Bradford Ross, General Counsel, and Harry R. Van Cleve, Jr., and Robert W. Perdue, Washington, D. C., with him on the brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

For two years, more or less, the Federal Power Commission has had before it several related proceedings, chief of which, for present purposes, are overlapping or competitive applications by Algonquin Gas Transmission Company (Algonquin) and by Northeastern Gas Transmission Company (Northeastern), each seeking a permanent certificate of public convenience and necessity, under § 7(c) of the Natural Gas Act, as amended, 52 Stat. 825, 56 Stat. 83,[1] authorizing the construction and operation of a natural gas pipe-line system, and the sale of natural gas to distributing companies and communities in the New England region.

On October 4, 1950, the Commission issued its Opinion No. 201, in which it found on the evidence before it that "the public convenience and necessity requires adequate and satisfactory natural gas service at a reasonable cost in the New England area." In subsequent stages of the proceedings, the Commission issued orders dividing up the territory between Algonquin and Northeastern, and issuing to each a certificate authorizing the construction and operation of a pipe-line system to serve the communities allocated to it. The certificate to Algonquin was granted by an order on February 26, 1951, accompanied by the Commission's Opinion No. 206.

Prior thereto, on December 21, 1950, Northeastern had submitted to the Commission a new application seeking exclusive authority to serve the whole New England area, including the communities which the Commission had theretofore allocated to Algonquin subject to a showing by Algonquin that it had an adequate supply of natural gas to serve such markets. By order of January 10, 1951, the Commission, without having set for hearing this new application by Northeastern, had denied the same "without prejudice to its refiling should the pending application of Algonquin be denied."

Subsequently, Northeastern filed in the Court of Appeals for the Third Circuit a petition to review the Commission's order of January 10, 1951, dismissing its new application, the Commission's order of February 26, 1951, granting the certificate to Algonquin, and two other related orders. The Court of Appeals held that the Commission had erred in granting the certificate to Algonquin without having had a hearing on the new and conflicting application by Northeastern; and entered judgment setting aside these two orders of the Commission (as well as the other two related orders) and remanding the case to the Commission for further proceedings not inconsistent with the Court's opinion. Northeastern Gas Transmission Co. v. Federal Power Commission, 3 Cir., 1952, 195 F.2d 872. We refer to the opinion in that case

1. "No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: * * *.

"In all other cases [except grandfather-clause certificates covered in a portion of the subsection omitted from the foregoing quotation] the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest." 15 U.S.C.A. § 717f(c).

for further details as to the various underlying proceedings before the Commission.

Algonquin procured a stay of the mandate of the Court of Appeals pending application to the Supreme Court for a writ of certiorari. On October 13, 1952, the Supreme Court denied certiorari in the case. 344 U. S. 818, 73 S.Ct. 31.

Meanwhile, acting on the authority of the outstanding certificate granted to it on February 26, 1951, Algonquin proceeded, at large expense, with the construction of its pipe-line system, which it had almost but not quite completed before October 23, 1952, when the mandate of the Court of Appeals went down to the Commission. The Commission, in compliance with the mandate, promptly reopened the proceedings for hearing the competitive applications by Algonquin and Northeastern, and certain related applications and matters; and these hearings are presently in progress before a presiding examiner of the Commission.

On October 21, 1952, anticipating the reopening by the Commission of the underlying proceedings upon receipt of the mandate of the Court of Appeals, Algonquin filed with the Commission an application for a temporary certificate of public convenience and necessity under the proviso of § 7(c) of the Natural Gas Act.[2] The application stated that on the faith of the certificate Algonquin's main line had been 99.9 per cent installed, that almost all of its lateral lines had been completed, and that if a temporary emergency certificate were granted, Algonquin would be in a position to operate its system within a matter of days. We set forth in the footnote a portion of the application, describing the emergency which in the view of Algonquin would justify the issuance of a temporary certificate under § 7 (c).[3] The prayer of the application was for the issuance by the Commission of "a temporary emergency certificate of public convenience and necessity authorizing appli-

2. Text quoted in footnote 1, supra.

3. "To delay gas service by Algonquin for this indefinite but protracted period for the completion of hearings will result in irreparable injury to (a) not only Algonquin's owners who have invested their money with assurance based on the authorization of the original certificate and (b) their supplier, Texas Eastern, that has similarly invested, based on its certificate and Algonquin's but (c) the customer companies and (d) the public served by these companies, including defense industries and those employed in such industries.

"Any delay to completion of the small portion of construction remaining to be done, as the result of failure to issue a temporary certificate may cause a much greater delay in completion and beginning of service by reason of (1) setting in of winter weather, (2) disruption of labor organization of contractors for Algonquin, (3) disruption of the hundreds of persons standing by for conversion work and (4) necessary protective measures to secure construction materials and equipment against loss or damage during a period of idleness of unpredictable duration which is not only expensive but involves delay in resuming work.

"Even a short delay in issuance of a temporary certificate, postponing gas service for causes stated * * * above will cause irreparable loss to distributing companies and their customers as more fully emphasized in the customer company affidavits annexed hereto. Some would be unable to complete appliance conversions and other work in time to enable them to begin distributing natural gas this winter. The results would include: monetary loss or increased cost to the companies and gas consumers, impairment of gas service or danger of such impairment. Cost increases ultimately affect the consumers by restricting ability of companies to make rate reductions or limit rate increases, or by limiting their ability to assure reliable, economical and unrestricted service to consumers. At this late date, aside from financial considerations, it would be physically impossible to secure supplies or make installations which the companies feel would be required if they are not to have natural gas from Algonquin immediately in order to insure adequate service this winter. These companies and the consumers that they supply are placed in this position because of their reliance upon securing natural gas service which the Commission had authorized Algonquin to render and the evidence of Algonquin's determination to render that service as evidenced by the progress of Algonquin's construction."

cant Algonquin Gas Transmission Company to continue with the construction and operation of its pipeline system and to render natural gas service to the customers specified to be served by Algonquin in Opinions Nos. 202 and 206, or their successors, and in the quantities set forth in such opinions without prejudice to any further action the Commission might take and pending determination of the application of Algonquin Gas Transmission Company in Docket No. G–1319."

Thus the application for a temporary certificate contemplated the completion of a new pipe-line system, and the sale of natural gas to a whole region which theretofore had got along without any natural gas service.

On October 31, 1952, the Commission issued an order (two members dissenting) dismissing for lack of jurisdiction Algonquin's application for a temporary certificate, upon a finding that such application did not "come within the purview of the authority of this Commission to grant." A rehearing of the application was had at Algonquin's request, but on November 26, 1952, the Commission entered a further order affirming its order of dismissal.

On December 5, 1952, Algonquin filed its petition now pending before us, seeking review of the Commission's order denying for lack of jurisdiction Algonquin's application for a temporary emergency certificate. Petitioner expressed doubt whether the order was presently reviewable by us under § 19 (b) of the Natural Gas Act, 15 U.S.C.A. § 717r(b), and as an alternative asked us to issue an order to respondent Commission to show cause why a writ of mandamus should not be issued under 28 U.S.C. § 1651, directing the Commission to vacate its orders of October 31 and November 26, 1952, and to hear and dispose of on the merits Algonquin's application for a temporary emergency certificate.

We issued the show-cause order, as requested, on December 5, 1952. The Commission promptly filed its answer, asserting that the order in question is reviewable, and reviewable exclusively, under § 19(b) of the Act; acquiescing in such review by this court, "forthwith if it so desires"; asking

that the alternative petition for a writ of mandamus be denied, and that this court vacate so much of its order of December 5, 1952, as required the Commission to show cause why such a writ should not be issued; and finally praying that its order of October 31, 1952, be affirmed. The Commission certified to this Court the transcript of the administrative record in the matter.

In view of the urgency asserted in the petition, we set the case for special hearing on December 16, 1952. At the outset, we denied motions by various persons for leave to intervene. Our memorandum explaining the reasons for denying the motions to intervene, which we read in open court, is annexed at the conclusion of this opinion.

We are certain that we presently have jurisdiction to review the order, under § 19(b) of the Act; and in view of the Commission's concession we shall not discuss this point at length.

Section 19(b) does not say that only "final" orders are reviewable. It says that any party to a proceeding under the Natural Gas Act "aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order" in the appropriate United States Court of Appeals. But it is well established, under similar language in other statutes providing for judicial review, that administrative orders of a merely preliminary or procedural character are not directly and immediately reviewable in the Court of Appeals. Federal Power Commission v. Metropolitan Edison Co., 1938, 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408; Eastern Utilities Associates v. Securities and Exchange Commission, 1 Cir., 1947, 162 F. 2d 385, 386 and cases cited. That does not mean that judicial review must necessarily await the ultimate order finally terminating the underlying proceeding; but the order to be reviewable must be administrative action of a substantial character approaching some degree of finality. See Phillips v. Securities and Exchange Commission, 2 Cir., 1948, 171 F.2d 180, 183.

■ Certain types of interlocutory orders, not immediately reviewable, may infect with invalidity the final order of the administrative agency; in which case, upon

judicial review of the final order, the interlocutory order will be reviewed so far as it may have affected the final order. But the order of October 31, 1952, now under review, was not that type of interlocutory order. The order dismissing for lack of jurisdiction Algonquin's application for a temporary emergency certificate—whether right or wrong—cannot affect the validity of whatever orders the Commission may ultimately issue on the competitive applications of Algonquin and Northeastern for permanent certificates of public convenience and necessity; and hence, the order in question will not be reviewable as an incident to review of such ultimate orders in the underlying proceedings. Although Algonquin's application for a temporary certificate was in form titled as a part of the underlying proceeding, it really should be regarded as carved out of the main proceeding and as partaking of the nature of a separate proceeding, in which the Commission was asked to exercise an asserted distinct substantive power under § 7(c) to meet an emergency situation, pending determination of what might be a protracted main proceeding. The Commission's order of October 31, 1952, finally disposed of that separate, substantive application; and hence we think the order was not "merely preliminary or procedural" in character, but had the necessary degree of finality to be immediately reviewable under § 19(b).

■ From this, it follows that so much of Algonquin's pending petition as seeks review by a writ of mandamus must be denied, since such an extraordinary writ may not properly be used as a substitute for the adequate statutory review procedure contained in § 19(b) of the Act.

We may say that if we had concluded that the order of October 31, 1952, was not now reviewable under § 19(b) of the Act, we would have been hesitant to review it by a writ of mandamus under 28 U.S.C. § 1651, the so-called all-writs section of the Judicial Code. Precedents like U. S. Alkali Export Association, Inc., v. United States, 1945, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554, must be applied with extreme caution lest the courts lay themselves open to the charge of reaching out for a jurisdiction which they may think it is too bad Congress has not seen fit to confer—and this under the pretext of issuing an extraordinary writ in aid of a jurisdiction elsewhere granted.

The Commission has asked us to vacate so much of our order of December 5, 1952, as required it to show cause why a writ of mandamus should not issue. We see no point in doing that. We issued the order to show cause ex parte, as requested in the petition. The Commission, in response thereto, has shown cause here, to our satisfaction, why a writ of mandamus should not issue. This is not to say that a writ of mandamus, directed to the Commission, would never be appropriate.

We now turn to the merits of this controversy. At the outset, it should be made clear that we are not faced with the question whether the issuance of a temporary certificate to Algonquin would contravene the mandate of the Third Circuit referred to above. Although several of the Commissioners alluded to this possibility, we do not think there is any such problem involved here. That decision dealt solely with an applicant's statutory right to a hearing where there are several competitive applications for a *permanent* certificate of convenience and necessity to supply the same service area. Here Algonquin is concededly the *sole* applicant for a *temporary* certificate of convenience and necessity—which temporary certificate, according to the express language of the statute, may be issued "without notice or hearing". Moreover, we find nothing in the statute to support the suggestion made by Commissioner Buchanan that no temporary certificate can ever be issued while competitive applications for a permanent certificate are pending; for, although the grant of a temporary certificate may possibly give the recipient a psychological advantage in the main proceeding, there is certainly no direct legal relationship between the two types of permits. In fact, Algonquin is in full agreement with the proposition that the grant of a temporary certificate to it would have no bearing whatsoever on its application for a permanent certificate.

The sole issue in this case, as we conceive it, is the narrow question whether, in view of the allegations contained in Algonquin's application, the grant of a temporary certificate to Algonquin to authorize it to complete its virtually finished pipe-line system to designated sections of Massachusetts, Rhode Island and Connecticut, and to begin supplying natural gas to these areas, would be within the Commission's statutory authority to "issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a [permanent] certificate * * *."

The crucial phrases are "to assure maintenance of adequate service" and "to serve particular customers".[4] What limitations are these alternative clauses intended to effect? To put it a little differently, was this emergency certificate provision, added in the 1942 amendments to the Natural Gas Act, designed to cover all emergency situations where a particular area of the country desperately needs natural gas and can ill afford to await the termination of a time-consuming proceeding upon an application for a permanent certificate, or was it merely intended to cover a narrow class of situations where, due to breakdowns in the service of operating natural gas companies, for example, or because of sudden unanticipated demands, temporary expansion of existing facilities is necessitated?

The bare words of the two clauses ("to assure maintenance of adequate service" and "to serve particular customers") are perhaps not conclusive. "*Maintenance* of adequate [natural gas] service" (italics added) seems to imply some pre-existing natural gas service which is to be kept up; thus this clause would appear to give support to the more limited interpretation above. Similarly, "to serve particular customers" might, as the Commission suggests, be read as meaning that the proposed service must be to present customers, i. e., to consumers now receiving natural gas service from the applicant for the temporary certificate,—which would give that clause

also a very restricted application. On the other hand, this latter clause might be read as importing no limitation whatsoever other than that the proposed customers must be particularized,—a rather meaningless formality.

In light of this somewhat ambiguous picture, we turn to the legislative history for some clearer indication of the Congressional intent in inserting these two qualifying clauses. The original § 7(c), involving a somewhat different regulatory scheme, did not have an emergency certificate provision in it, 52 Stat. 825. Nor did the original draft of the 1942 amendments. H.R. 4819, 77th Cong., 1st Sess. At the behest of the natural gas companies, a provision authorizing the issuance, without notice or hearing, of temporary certificates in cases of emergency was inserted. H.R. 5249, 77th Cong., 1st Sess., July 7, 1941. This provision, however, met with substantial objection from the representatives of the various competing interests, on the ground that such an unqualified grant of authority was too broad. The upshot was that the opposing groups accepted the insertion of the limiting phrase "to assure maintenance of adequate service or to serve particular customers". The object of inserting this phrase, according to Commissioner Manly, who testified at length before the House Committee, was to assure that the emergency provision "would not authorize the granting of temporary certificates for the purpose of enlarging a market but merely for the purpose of maintaining adequate service within the market that is already being served." Hearings before Committee on Interstate and Foreign Commerce on H.R. 5249, 77th Cong., 1st. Sess. 6 (1941). This also was the understanding of Mr. John D. Battle, who represented a number of the competing groups at the committee hearing. See id. at 51. The Federal Power Commission, having been invited by the House Committee to report its views on the pending bill as amended, offered this comment (id. at 82, 83–84):

"The [original] language in subsection (c) [relating to the grant of tem-

---

4. It is for the Commission to find as a matter of fact whether the requisite emergency exists.

porary certificates] was put in the bill primarily to provide for emergency interconnections of pipe lines, which are sometimes necessary to make it possible to maintain adequate service in cases of extraordinary peak demands, breakdowns, and so forth.

\*   \*   \*   \*   \*   \*

"Subsequent to the introduction of H.R. 5249 conferences were had by representatives of the Commission with representatives of the railroad, coal, and labor interests, and with counsel for certain of the natural-gas companies. As a result of these conferences the following amendments to H. R. 5249 were agreed to \* \* \*

"(1) Following the word 'emergency' in line 1 on page 3, insert 'to assure maintenance of adequate service or to serve particular customers.'

\*   \*   \*   \*   \*   \*

"The chief purpose of change (1) was to avoid grant of a temporary certificate for a complete new pipe-line system and to limit the authority for granting a temporary certificate to emergency situations involving only a comparatively minor extension or enlargement of the facilities of an existing system."

The House Committee adopted the proposed qualification, and in its report, accompanying the final version of the bill, stated:

"The committee amendment [inserting the words 'to assure maintenance of adequate service or to serve particular customers'] was made to limit the authority for granting a temporary certificate to emergency situations involving only a comparatively minor extension of the facilities of an existing system." H.R.Rep. No. 1290, 77th Cong., 1st Sess. 5 (1941).

In this form, and with these uncontradicted statements in the record as to the purpose of the qualifying phrase, the bill was passed by the House and Senate without further debate.

As far back as 1949, the Commission, pursuant to its rule-making authority, adopted regulations in regard to the granting of temporary certificates wholly in accord with the tenor of the above-indicated limitations. 14 F.R. 682, as amended, 17 F. R. 7389.

█ Algonquin seeks to avoid the rather clear import of this legislative history by pointing out that we are here dealing with a wholly novel situation, which most likely was not within the contemplation of Congress when it adopted these amendments. It is said that since the competitive interests for whose principal benefit the qualifying phrase in § 7(c) was enacted have already had their day before the Commission (culminating in Opinion No. 201 above referred to), the entire legislative background of § 7 (c) should be disregarded. The Commission challenges Algonquin's factual premise in this regard, pointing out that representatives of the coal, railroad, and labor interests are "actively participating" in the hearing currently in progress in the related underlying proceedings involving the consideration of the conflicting applications by Algonquin and Northeastern for a permanent certificate of public convenience and necessity. Be that as it may, we do not think that the limiting effect of the phrase "to assure maintenance of adequate service or to serve particular customers" can be escaped by pointing to the fact, if it be a fact, that the primary motive of Congress in inserting that qualifying language in the amendment to § 7(c) may not be served in this particular case. In other words, if the effect of the limiting language is to forbid the Commission, by the device of a temporary certificate, to authorize the sale of natural gas to an area having as yet no natural gas service, the Commission and the courts must respect that limitation; and it is no answer to speculate that if the Congress had thought of the possible occurrence of a special and peculiar situation like that now before us, it might have so qualified the limiting language as to authorize the granting of a temporary certificate in this particular case.

Also, Algonquin argues that since its pipe-line system had already been virtually completed prior to the invalidation of its certificate, and since very little further con-

*struction* is now required, this case comes within that limited category of cases where the grant of a temporary certificate is authorized. But even giving the statute a liberal construction, and keeping the public interest uppermost in mind, as is appropriate in these cases, we cannot escape from the fact that no natural gas company has ever been validly certificated to supply natural gas to the general area for which Algonquin here seeks a temporary permit. Thus, we are not dealing with the maintenance or expansion of any existing operating facilities but rather with the requested authorization for the introduction of natural gas into a wholly new region, through a wholly new pipe-line system. And this latter result is precisely what the qualifying clause added to the emergency certificate provision in § 7(c) was designed to prevent from being accomplished via the ex parte route of a temporary certificate.

Algonquin makes the further point that if the Third Circuit litigation had been strung out a little longer, it would have had the construction of its pipe-line system fully completed, and would have been actually supplying natural gas to the New England communities covered by its certificate, all before the judgment of the Court of Appeals finally took effect in setting the certificate aside; that then the Commission would certainly have had power under § 7(c) to issue an emergency temporary certificate "to assure maintenance of adequate service"; that the power of the Commission should not turn upon such a fortuitous circumstance, for the factors constituting an emergency and hardship facing the New England areas in question could not be regarded as essentially different, whether such communities were suddenly cut off from an existing flow of natural gas, or were deprived of an anticipated source of supply upon which they had confidently counted. In the case supposed, it is by no means clear that the statutory phrase "to assure maintenance of adequate service" would be construed to include maintenance of a natural gas service no longer authorized by a valid outstanding certificate issued by the Commission under the provision of the Natural Gas Act. Since we do not have

the problem before us, we do not undertake to say what would have been the decision if Algonquin had had its system in operation prior to the invalidation of its certificate. It is enough to say that we are clear on the proper disposition of the case actually before us.

A judgment will be entered affirming the order of the Commission.

## Appendix.

### Memorandum on Denial of Motions for Leave to Intervene

PER CURIAM.

We have for hearing a petition by Algonquin Gas Transmission Company, sole petitioner, against the Federal Power Commission, sole respondent, asking us to review and set aside an order of the Commission, dismissing for lack of jurisdiction to entertain it an application by Algonquin for a temporary certificate of public convenience and necessity under § 7(c) of the Natural Gas Act.

The only relevant questions presented by the petition are questions of law:

(1) As to our own jurisdiction to review the Commission's order, either under § 19 (b) of the Natural Gas Act, or by way of a writ in the nature of mandamus under 28 U.S.C. § 1651, the so-called all-writs section of the Code.

(2) Whether, assuming our own jurisdiction to review the order at this time, the Commission committed an error of law in its ruling that it lacked statutory power to entertain Algonquin's § 7(c) application and to dispose of it on the merits.

The merits of Algonquin's application to the Commission are not before us. We are not here to take testimony as to the fact and details of the emergency alleged to exist. Nor are the allegations in Algonquin's 7(c) application in this respect to be embellished or enlarged by arguments of counsel.

In view of the representations of hardship and urgency contained in the petition, we accelerated the hearing thereon by setting the case down for today, out of regular course.

The Court does not propose that our hearing and consideration of the limited issues above stated shall be bogged down by arguments on various motions for leave to intervene which have been submitted, and by oral arguments and briefs on behalf of the numerous would-be intervenors. We have decided to deny all the pending motions for leave to intervene, and an alternative motion on behalf of Boston Consolidated Gas Company for leave to appear as amicus curiae and to be heard orally and by brief is also denied.

■ Under § 15(a) of the Natural Gas Act, the Commission is given the broadest authority to permit intervention in administrative proceedings, including authority to admit as a party "any other person whose participation in the proceeding may be in the public interest." But nothing in the Act makes it mandatory upon a court of appeals, on review of a Commission order, to allow applications for leave to intervene, merely because the applicant had been admitted as a party to the administrative proceeding below. The matter lies within our discretion, and in general we guide ourselves by analogy to Rule 24 of the Federal Rules of Civil Procedure, 28 U.S.C.

Numerous public utilities interested in obtaining natural gas from Algonquin have asked leave to intervene as parties petitioner, associating themselves with the original petitioner in attack on the Commission's order. The facts of their respective situations are not before us for exploration, except as such facts are set forth in Algonquin's 7(c) application. What they could say on the legal issues above outlined could only be cumulative, and we have no doubt that those legal issues will be fully and ably presented by counsel for the original petitioner. If any of these public utilities have standing as parties aggrieved to file their own petitions for review, they might have done so, and we would have had power, but as a matter of discretion only, to consolidate such petitions with Algonquin's pending petition for purposes of hearing. But we are not obliged to permit them to ride in on Algonquin's petition by the procedure of a motion for leave to intervene.

We also have before us a motion by Northeastern Gas Transmission Company and Tennessee Gas Transmission Company for leave to intervene as parties respondent. The motion states that their "right" to intervene and be heard as parties in this litigation is made clear by the decision of the Supreme Court in Ashbacker Radio Corp. v. Federal Communications Commission, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108. That case, we think, is not remotely in point. It might be in point if Northeastern and Algonquin had filed mutually exclusive applications for a temporary certificate under § 7(c), and if the Commission had entered an order granting Algonquin's petition without affording a hearing to Northeastern on its application. Northeastern might then have had standing, under the Ashbacker decision, to file a petition for review in the appropriate court of appeals, seeking to have the Commission's order set aside, assuming for present purposes that the court would have jurisdiction at that stage to entertain a petition to review. But here, Northeastern is seeking leave to intervene as a party respondent, to defend the Commission's ruling that it had no statutory power to entertain Algonquin's 7(c) application. We have no doubt that the Commission can take care of itself on this matter, through its own counsel, and that argument by Northeastern would be repetitious and cumulative. The Court denies the motion by Northeastern and Tennessee Gas for leave to intervene.

WOODBURY, Circuit Judge (dissenting).

I quite agree that for the reasons stated by Chief Judge MAGRUDER Congress did not intend to give the Commission power to issue temporary certificates without notice or hearing authorizing the construction of wholly new natural gas lines to serve wholly new regions. But Algonquin is not asking for a temporary certificate authorizing it to build a wholly new line, and the area it seeks to serve has already been determined by the Commission to be in need of an adequate supply of natural gas.

Algonquin virtually completed its line under the authority of its permanent certifi-

cate. All that now remains to be done to put the line in operation is to connect it up, which requires only two or three welds taking a few days time and the expenditure of a relatively insignificant amount of money.

It is true that the southern New England communities involved have not yet actually been supplied with natural gas. But spokesmen for competitive fuels and competing interests have already had their day before the Commission, and have lost out. The Commission has decided that southern New England needs an adequate supply of natural gas, and Algonquin, before its permanent certificate was revoked, had for all practical intents and purposes completed its line to supply that need. It is now certain, therefore, that the southern New England communities involved will have natural gas, for it is inconceivable that at this late day the Commission will reverse its position and decide not to issue a permanent certificate to anyone authorizing the transmission of natural gas to those communities. In consequence competing fuels are out as far as the southern New England market is concerned, either in the immediate future if we tell the Commission it has the power to issue the temporary certificate asked for, or at some later date when the Commission issues its order in the presently pending proceeding for a permanent certificate. Thus the purpose of the statutory provision under consideration, as disclosed by its legislative history, would not be thwarted by holding that the Commission had power to give the relief requested by Algonquin.

Moreover, if the litigation in the Third Circuit had consumed only a week or ten days more time, Algonquin would have actually had its line in operation by the time the certificate under which it built the line became a dead letter, and in that situation I think the Commission clearly would have power under the statute to issue a temporary certificate permitting Algonquin to continue to use its line for the time being "to assure maintenance of adequate service," assuming, of course, a case of emergency.

It seems to me that, if we can, we should avoid a construction of the statute which makes its application depend upon so fortuitous a matter of timing. And I think it would be entirely proper for us to do so for the considerations briefly outlined above.

I would say that Algonquin's line being now to all intents and purposes complete, and competing fuels all but displaced, no violation of the statutory purpose as disclosed by its legislative history would result from our construing the statutory language broadly, and holding that the Commission has power to issue a certificate authorizing Algonquin to use its line temporarily "to assure maintenance of adequate service" in the area, if it should find that the local gas companies in that area were unable adequately to supply their customers because in anticipation of natural gas they have failed to make arrangements assuring a supply of artificial gas during the months to come. In short, in the peculiar circumstances of this particular case, I would not read the phrase above quoted with the words "natural gas" inserted before the word "service," but would interpolate only the word "gas."