**NORTHEAST AIRLINES, INC.,**
Petitioner,

v.

**CIVIL AERONAUTICS BOARD,**
Respondent.

No. 6365.

United States Court of Appeals
First Circuit.

May 7, 1965.

———◆———

Loyd M. Starrett, Boston, Mass., with whom Henry E. Foley and Foley, Hoag & Eliot, Boston, Mass., were on brief, for petitioner.

Frederic D. Houghteling, Attorney, C. A. B., with whom William H. Orrick, Jr., Asst. Atty. Gen., Lionel Kestenbaum, Atty., Dept. of Justice, John H. Wanner,

Gen. Counsel, C. A. B., Joseph B. Goldman, Deputy Gen. Counsel, C. A. B., O. D. Ozment, Associate Gen. Counsel, Litigation and Legislation, C. A. B., and John M. Stuhldreher, Atty., C. A. B., were on brief, for respondent.

Before WOODBURY, Chief Judge, ALDRICH, Circuit Judge, and CAFFREY, District Judge.

CAFFREY, District Judge.

Northeast has petitioned for review of a refusal by the Board to rule that a set-off arrangement between petitioner and one of its trade creditors is not inconsistent with or violative of Section 403 of the Federal Aviation Act of 1958 (49 U.S.C. § 1373).

By way of background, it appears that on September 5, 1963 Northeast filed an application with the Board stating that as of June 30, 1962 it had been indebted to various creditors for substantial sums; that the amount of the sums was undisputed, already due and, in many cases, overdue, and unconditionally payable; that on July 1, 1962 Northeast had informed these creditors that they could obtain payment in whole or in part of these sums by setting off amounts which thereafter would become due to Northeast for such transportation as these creditors of Northeast might thereafter elect to obtain from Northeast; and that subsequent to July 1, 1962 Northeast has in fact discharged portions of its indebtedness to some of its creditors by the use of such set-offs. The petition did not set forth the number of creditors involved in this arrangement, the amount due to any individual creditor, or the total amount due to all creditors. The petition was silent as to what, if any, arrangement had been made by Northeast for payment of sums due or overdue to any of its creditors who did not elect to avail themselves of Northeast's transportation services.

The request for exemption contained in the petition filed September 5, 1963, under Section 416(b), (49 U.S.C. § 1386 (b)), was based on what Northeast called its "excessive overdue indebtedness."

The Board denied petitioner's request, refused to enter either of the orders requested, and dismissed the application on January 16, 1964. The Board noted that this action was premised on a finding that Northeast's application of September 5, 1963 was inadequate to advise the Board as to "the amount of indebtedness which would be discharged in the manner proposed by Northeast, the identity and number of the individuals which may be involved, or the period within which such indebtedness is anticipated to be discharged."

Petitioner filed a new application on February 17, 1964 limited to a request for a declaratory order to the effect that its arrangements with one particular trade creditor, Sperry Rand Corporation, did not violate Section 403 of the Act. This new application recited certain specific facts in an attempt by Northeast to eliminate the uncertainties which formed the basis of the Board's denial of the first petition. It alleged that between October 1961 and June 1962, Northeast had purchased various mechanical items from Sperry on open account at standard list prices set out in Sperry's published catalogues; that these purchases resulted in an undisputed balance due from Northeast to Sperry as of June 30, 1962 in the amount of $8554.04. It further alleged that Sperry thereafter agreed in writing to accept payment of the $8554.04 in equal instalments of $237.61 per month over a 36-month period. Northeast agreed to pay six per cent interest on the unpaid balance of this debt from time to time. Northeast and Sperry further agreed that Northeast's debt to Sperry might be further reduced by off-setting any amounts thereafter becoming due from Sperry to Northeast for air transportation purchased by Sperry from Northeast, computed at Northeast's published tariff rates.

The record indicates that during the 16-month period, September 1962 through December 1963, Northeast made

monthly payments in the total amount of $2851.32 and that Sperry obtained transportation services from Northeast in the total amount of $5116.52, leaving a balance due as of January 1, 1964 of $586.20, plus interest at six percent. While the agreement between Northeast and Sperry is silent as to which portion of Northeast's obligation is to be discharged by set-offs for transportation furnished to Sperry, it would appear from the conduct of the parties that they contemplated that a regular payment of $237.61 would be made month after month without regard to the amount of transportation services purchased by Sperry in any given month, with the practical result that purchases of transportation by Sperry were used by Northeast to offset and cancel the monthly payments to become due at the end of the 36-month period in reverse order commencing with the payment due in August 1965.

Eastern Airlines filed an answer opposing Northeast's application of February 17, 1964, in which Eastern alleged that as a competitor of Northeast it would be injured by the continuation of the practice proposed by Northeast and Sperry and that the practice was illegal as a violation of Section 403. Northeast filed a reply to Eastern's answer challenging the validity of Eastern's conclusions. On May 22, 1964, the Board denied Northeast's February 17, 1964 application.

The Board's decision was based in part on a ruling that the transportation charges to be incurred by Sperry in the future were not independently incurred and that there was an obvious tie-in between Northeast's debts and Sperry's utilization of air transportation. The Board noted that while the agreement did not legally obligate Sperry to purchase air transportation services from Northeast, nevertheless the proposed agreement gave Sperry a strong incentive to use Northeast to the exclusion of other carriers offering comparable service. The Board found that the contemplated use of an off-set over a three-year period was no less a barter transaction than would be an agreement by which Northeast bound itself to furnish transportation to a supplier of goods and services in return for a certain amount of the merchandise of the supplier. Concluding that for these and other reasons Northeast's arrangement with Sperry violated Section 403, the Board denied Northeast's request for a declaratory order, whereupon the present petition for review was filed with this court on July 9, 1964.

We are met at the threshold with the jurisdictional question of whether or not the Board's order is reviewable in view of the fact that it did not direct petitioner to cease and desist from the practice in question nor otherwise directly impose any legal obligation on Northeast with regard to the arrangement. The order did, however, set forth the Board's interpretation of the Act as applied to the specific facts alleged by Northeast in its petition. The Board does not contest the appropriateness of judicial review of the order, and points out in its brief that petitioner's continued performance under this arrangement or under similar arrangements with other creditors might very well subject Northeast to substantial civil penalties under Section 901(a) of the Act. (49 U.S.C. § 1471(a).)

The question whether the Board's determination is appropriately reviewable at this point is essentially one of the proper timing of judicial review and of whether this matter involves a sufficiently particularized controversy which is final in the sense that it is an at least firm (and perhaps binding) adoption of a position by the agency with regard to a course of conduct on the part of a member of the regulated industry which does not require further administrative action other than the possible imposition of sanctions. Among the factors to be considered are the relative formality of the agency's position, the degree of potential harm to the petitioner and the relative clarity of the issue presented for review. The Board's determination is not a mere advisory or interpretive opinion with regard to Section 403(b).

Rather, it constitutes the adoption of a firm stance taken in the light of a well-defined body of judicial interpretation of a statutory provision similar to the one in question, and taken in response to a definite course of conduct proposed by Northeast. The Board's determination raises a clearcut legal issue, the basic or underlying facts being undisputed. We think that in the words of former Chief Judge Magruder (Algonquin Gas Transmission Co. v. Federal Power Comm'n., 201 F.2d 334, 337 (1 Cir. 1953), we are confronted with "administrative action of a substantial character approaching some degree of finality." We think that the Board's determination affords Northeast a Hobson's choice—both with regard to its business planning and with regard to the possible imposition of statutory penalties.

In Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L. Ed. 910 (1956), the Court held that an order of the Interstate Commerce Commission was subject to judicial review although the order therein was issued after an investigation instituted by the Commission on its own motion and was, in effect, a declaratory ruling that certain commodities specified therein were not "agricultural commodities" within the meaning of Section 203(b) (6) of the Interstate Commerce Act. That order, like the instant order, did not direct any particular carrier to cease and desist from carrying the commodities involved unless the carrier first obtained a certificate of public convenience and necessity, nor did that order impose any specific legal obligation on any named carrier. The Court observed, nevertheless, (at page 44, 76 S.Ct. at page 571), that the order of the Commission

"has an immediate and practical impact on carriers who are transporting the commodities, and * * * warns every carrier, who does not have authority from the Commission to transport those commodities, that

it does so at the risk of incurring criminal penalties. * * * The determination made by the Commission is not therefore abstract, theoretical, or academic. * * * The 'order' of the Commission which classifies commodities as exempt or nonexempt is, indeed, the basis for carriers in ordering and arranging their affairs. * * * The 'order' of the Commission is in substance a 'declaratory' one * * * which touches vital interests of carriers and shippers alike and sets the standard for shaping the manner in which an important segment of the trucking business will be done. * * * The consequences we have summarized are not conjectural."

The above-quoted language of the Court is equally applicable to the order of the Board in the instant case and on the record before us we rule that judicial review at this time is appropriate.

We now turn to the merits. Northeast argues that its arrangement with its supplier creditors does not violate Section 403 because the cancellation of overdue debts by its creditors in exchange for transportation furnished by it is equivalent to payment in cash for such transportation. Section 403 has not previously been the subject of judicial construction and perforce in support of its petition Northeast relies on cases arising under the analogous portion of the Interstate Commerce Act [1] holding that transportation charges may be paid by check, and cases holding that a court judgment obtained by a shipper against a carrier may be set off against the judgment obtained by the carrier against the shipper for transportation charges. Petitioner also argues that the off-set of mutual debts by private agreement is equivalent to the payment of those debts in cash.

The Board takes the position that under the circumstances involved herein the cancellation of Northeast's overdue obligations in consideration of transporta-

---

1. Section 403 was taken directly from the Hepburn Act of 1906, 34 Stat. 534, now found at 49 U.S.C. § 6(7).

tion provided to its creditors is in no sense the equivalent of cash payment for such transportation; that the arrangement operates to give Northeast an unfair competitive advantage over competing airlines and also discriminates in favor of those of Northeast's creditors who in the course of their business can utilize Northeast's services over those of its creditors who from the nature of their business cannot utilize its services; and that the agreement, in any event, embraces a credit arrangement not provided for in any of Northeast's published tariffs.

■ As noted above, the provisions of Section 403 were taken directly from the Interstate Commerce Act, 49 U.S.C. § 6 (7), and consequently those decisions interpreting the Interstate Commerce Act are the best guide lines available for the resolution of the instant controversy. The leading cases are Louisville & N. R. R. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911), and Chicago, I. & L. Ry. Co. v. United States, 219 U.S. 486, 31 S.Ct. 272, 55 L.Ed. 305 (1911). In Mottley the Court held, 219 U.S. at p. 477, 31 S.Ct. at p. 268:

> "The passenger has no right to buy tickets with services, advertising, releases, or property, *nor can the railroad company buy services, advertising, releases, or property with transportation.* The statute manifestly means that the purchase of a transportation ticket by the passenger, and its sale by the company, shall be consummated only by the former paying cash and by the latter receiving cash of the amount specified in the published tariffs." (Emphasis added.)

In the Chicago, I. & L. Ry. Co. decision, handed down the same day as Mottley, it appears that the railroad had entered into an agreement with a magazine publisher calling for the exchange of transportation services for advertising. The railroad sought to defend the arrangement on the grounds that the advertising purchased by it was valued at the magazine's published rates open to all other advertisers, while the transportation service given to the advertiser in exchange was valued at the railroad's regularly published tariff rates.

The facts in the Chicago, I. & L. Ry. Co. case closely approach those in the instant case, in which the record indicates that Northeast exchanged transportation at its tariff rates for mechanical items priced at Sperry's published catalogue prices. The Court, in pertinent part, observed, 219 U.S. at p. 496, 31 S.Ct. at p. 274:

> "The decisive question in this case is * * * could the company, in return for the transportation which it agreed to furnish * * * accept as compensation for such service anything else than money, the amount to be determined by its published schedule of rates and charges? * * * the answer to the above question must be in the negative. The acceptance by the railway company of advertising, not of money, in payment of the interstate transportation * * * was * * * in violation of the commerce act. * * * The legislative department intended that all who obtained transportation on interstate lines should be treated alike in the matter of rates * * *. Those ends cannot be met otherwise than by requiring transportation to be paid for in money, which has a certain value, known to all, and not in commodities or services, or otherwise than in money."

The Court concluded by brushing aside defenses based on state statutes on the basis of the supreme law clause.

To the same effect see New York Central & H.R. R.R. v. Gray, 239 U.S. 583, 36 S.Ct. 176, 60 L.Ed. 451 (1916).

Petitioner's reliance on Chicago & N. W. Ry. Co. v. Lindell, 281 U.S. 14, 50 S.Ct. 200, 74 L.Ed. 670 (1930) is not warranted on the record before us. In that case the Court ruled that allowing the off-set of cross-claims which terminated in simultaneous money judgments did not violate

the rule that transportation charges must be paid for in cash. Lindell is distinguishable, first, because there is no indication that there was any prior agreement therein between the carrier and its creditor in advance of the carrier's furnishing the transportation for which the carrier brought suit, and, also, because there was no arrangement in Lindell for the payment of transportation charges over the substantial period of time involved herein. The cross-obligations in Lindell represented by the conflicting judgments both appear to be unconditionally payable on demand, while in the instant case it was contemplated that Northeast would discharge its obligation over a period of 36 months, during which time Sperry had the option of accepting transportation services and off-setting the value thereof.

Northeast's reliance on Fullerton Lumber Co. v. Chicago, M., St. P. & P. R. R. Co., 282 U.S. 520, 51 S.Ct. 227, 75 L.Ed. 502 (1931), which held that payment by check satisfied the requirement that transportation charges be paid in cash, is misplaced, since payment by check cannot on any rational basis be equated with payment in miscellaneous mechanical parts and devices, which, in essence, constituted the real *quid pro quo* for Northeast's transportation services to Sperry.

The Board correctly points out that although at the time Northeast made its arrangements with Sperry, Northeast's obligations for merchandise supplied by Sperry were undisputedly overdue debts, the effect of the arrangement between petitioner and Sperry was to convert Northeast's obligation from a liquidated overdue debt to a liquidated instalment obligation payable over the next 36 months, i. e., the parties by this contract converted a matured and overdue debt into a debt which would become due in instalments over a period of three years. Accordingly the Board contends that the arrangement violates Section 403 in five different ways.

Suffice it to say that the Board correctly points out that, at the very least,

(1) the arrangement tying-in the purchase of transportation by petitioner's supplier-creditors with petitioner's pre-existing debt to those supplier-creditors gives such supplier-creditors more advantageous terms in the purchase of transportation services than the terms available and given to petitioner's other customers who must pay cash on the counter-top for their transportation, and (2) the arrangement secures for Northeast an advantage over its competitors in the sale of air transportation based on a forbidden tie-in between the transportation offered and extraneous relationships and transactions between the parties.

The facts in the present case as they appear from the record indicate that the initial sale transactions by Sperry to Northeast were independent of and not made in contemplation of the later-devised plan of set-off of the prices of Sperry's goods sold against transportation furnished at tariff rates by Northeast to Sperry at the latter's option. Nonetheless, an interpretation of the statute which adopts, in effect, a rule of *per se* illegality for any privately arranged exchange or set-off of such values or prices (unless formulated under ground rules expressly formulated by regulations prescribed by the Board) is defensible on the basis that it is essential to the statutory scheme of comprehensive regulation to preclude any possibility of integrated transactions being accomplished by being broken into ostensibly independent steps and, furthermore, to preclude saddling the Board with the necessity of policing or examining such business dealings between carriers and customers in order to ascertain whether a disguised step-transaction is or is not being effectuated by a carrier in any case in which an outright cash or check payment is not used.

Since Section 403 is taken almost literally from the Hepburn Act, supra, it is clearly deducible from the opinions of the Supreme Court construing the progenitor of Section 403, that the Congressional policy in the area of

transportation requires that all who obtain transportation in interstate commerce should be treated absolutely alike and that all should be on a plane of equality. (Chicago, I. & L. Ry. Co. v. United States, supra, 219 U.S. at 496, 31 S.Ct. 272.) Having these policy considerations in mind, there can be no doubt that the Board correctly ruled that the instant arrangement violates Section 403 in that it contemplates a payment other than in cash or its direct equivalent.

The particular agreement involved herein also must be struck down because it violates Section 404 [2] of the Federal Aviation Act, 49 U.S.C. § 1374, in that, as explained above, the agrement tends to discriminate against Northeast's competitors and it also tends to treat differently those of Northeast's creditors who can, and those of its creditors who cannot, utilize its transportation services in their business.

Decree will be entered affirming the order of the Board.

ALDRICH, Chief Judge (concurring).

I prefer to dispose of the merits in a less comprehensive manner. Section 403 of the Federal Aviation Act requires payment for transportation to be made essentially in cash. See Fullerton Lumber Co. v. Chicago, M., St. P. & P. R. R., 1931, 282 U.S. 520, 521–522, 51 S.Ct. 227. If one assumes that the parties here did not enter into the questioned transportation arrangement until after the indebtedness had been finally settled on a monthly payment basis, the tickets clearly were not paid for in cash. A time note is not the equivalent of cash. Its value depends upon factors of credit, interest rate, etc., as any glance at the bond market, even for government bonds, must reveal. The arrangement does not become any less vulnerable if the extension of Northeast's indebtedness and the undertaking to pay on demand only in transportation services were made in one integrated agreement. It must be

that the indebtedness which the parties were compromising was not the equivalent of cash, or no compromise of this nature would have been necessary. Obviously, also, it was not a case of Sperry buying tickets in advance which it could redeem for cash at any time. Sperry did not have the equivalent of cash before it made the agreement, or afterwards. Consequently on no theory was the cash requirement of section 403 met by equivalence.

---

2. The Board did not premise its decision on a violation of Section 404.