**Lisa B. KEMLER, et al., Plaintiffs,**

v.

**Charles E. POSTON, et al., Defendants.**

**No. Civ.A. 3:00CV146.**

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 11, 2000.

---

Victor M. Glasberg, Kelly M. Baldrate,
Victor M. Glasberg & Associates, Alexan-

dria, VA, Rebecca K. Glenberg, ACLU of Virginia, Richmond, VA, for plaintiffs.

Peter R. Messitt, Office of the Attorney General, Richmond, VA, for defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

Plaintiffs Lisa B. Kemler and James C. Clark, substitute judges in the state of Virginia, are suing for declaratory and injunctive relief. They claim that an advisory opinion issued by the Judicial Ethics Advisory Committee ("JEAC"), which is susceptible of enforcement by the Judicial Inquiry and Review Commission ("JIRC") and the Supreme Court of Virginia, violates their rights under the First and Fourteenth Amendments to the Constitution of the United States. The advisory opinion takes the view that, to avoid the appearance of impropriety, Virginia judges must refrain from voting in primary elections. The Defendants are committee members of JEAC and JIRC.

Defendants have moved to dismiss the action, arguing that: (1) the Complaint fails to set forth a case or controversy sufficient to support the exercise of jurisdiction by this Court; and (2), even if the Court has jurisdiction, it should abstain from hearing the case. For the reasons set forth below, Defendants' Motion to Dismiss is GRANTED.

## FACTUAL BACKGROUND

**The Canons Of Judicial Conduct: Interpretation, Investigation, And Enforcement**

To ensure that only persons of the highest ethical standards be maintained as judges within her judiciary, the Commonwealth of Virginia provides for the regulation of judicial ethics by certain rules and procedures. To this end, the Supreme Court of Virginia promulgated the Canons of Judicial Conduct. The canons, together with the rules promulgated thereunder, are, by the terms of their preamble, "in-tended to govern conduct of [Virginia] judges and to be binding upon them."

Canon 2 states that: "[a] judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." The advisory commentary on Canon 2 provides:

Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

The prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional and personal conduct of a judge. Because it is not practicable to list all prohibited acts, the proscription is necessarily cast in general terms that extend to conduct by judges that is harmful although not specifically mentioned in the Canons. Actual improprieties under this standard include violations of law, court rules or other specific provisions of these Canons. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity and impartiality is impaired.

Canon 5 instructs that: "A Judge Shall Refrain From Political Activity Inappropriate to the Judicial Office." Canon 5.A., captioned "Political Conduct In General," prohibits judges from holding office in political organizations, making speeches for such organizations, or endorsing or opposing candidates and fund raising for, or making contributions to, political organizations or candidates. Canon 5.A.(1)(a)–(c). Canon 5.A(2) requires a judge to resign from office upon becoming a candidate in a primary or general election, excepting a

candidate for a constitutional convention. Finally, Canon 5.A(3) prohibits judges from engaging in "any other political activity except in behalf of measures to improve the law, the legal system, or the administration of justice."

The JEAC, a committee established by order of the Supreme Court of Virginia dated January 5, 1999 ("January 5 Order"), is composed of nine members, five of whom are active or retired judges, two of whom are attorneys, and two who are laypersons. *See id.* The JEAC's purpose is "to render advisory opinions concerning the compliance of proposed future conduct with the Canons of Judicial Conduct." [1] Thus, the JEAC renders informal ethical opinions to guide judges who present questions "not of general substantial interest and continuing to concern to the judiciary or the public." Any judge whose conduct is subject to the Canons of Judicial Conduct may request an advisory opinion about the propriety of his or her conduct or proposed conduct. *Id.*

According to the January 5 Order, opinions issued by the JEAC are advisory. Thus, they are not binding on the two State entities that are charged with investigating and regulating judicial conduct, the JIRC and the Supreme Court of Virginia, although compliance with an advisory opinion may be considered evidence of good faith if the JIRC or the Supreme Court were to conclude that an advisory opinion incorrectly approved of conduct later determined to be a violation of the Canons. Also, the January 5 Order makes clear that the JEAC "may not issue an opinion that interprets any constitutional provision, statute, rule or regulation that does not relate to judicial ethics."

The JIRC, an entity established by Article VI § 10 of Virginia Constitution, is "vested with the power to investigate charges which would form the basis for retirement, censure or removal of a judge." Article XI, § 10, Virginia Consti-

tution. JIRC investigates complaints of ethical violations by judges, and may order and conduct hearings. *See* Va.Code § 2.1–37.4. The Code of Virginia sets forth a procedure for conducting hearings, vesting in the JIRC the power to petition for an order compelling testimony and the production of documents, and for ordering depositions. If the counsel to the JIRC determines that a complaint alleges a violation of the Canons of Judicial Conduct or forms the basis for retirement, censure, or removal of a judge, counsel is directed to present the complaint to the JIRC as an inquiry. *See* Rule 3(A)(4), Rules of the JIRC. If the JIRC decides the inquiry lacks merit, it shall dismiss it. *See* Rule 3(A)(6). If the JIRC decides that the charge, if well-founded, would be the basis for retirement, censure, or removal of a judge, the JIRC may order a formal hearing on the charge. *See* Rule 3(B)(2).

After the JIRC investigates a charge, it may remove the charge from its docket, file a complaint against the judge in the Supreme Court of Virginia if it finds the charge to be well-founded and of sufficient gravity to constitute the basis for retirement, censure, or removal, or, if the JIRC finds that the charge is not of such sufficient gravity, it may advise the judge of its findings and remove the charge from its docket but consider the charge with any other future charges against the judge. The JIRC also has the discretion to meet with a judge to discuss the allegations informally, and to discuss possible solutions. *See* Rule 4.

If the JIRC finds that a complaint of judicial misconduct involving a violation of the Canons is well-founded and of sufficient seriousness to be a basis for retirement, censure or removal, the JIRC presents a complaint against the judge to the Supreme Court of Virginia. "Upon the filing of a complaint, the Supreme Court shall conduct a hearing in open court and," if the Supreme Court finds "that the judge has engaged in misconduct while in office,

---

1. January 5 Order, introductory paragraphs.

or that he has persistently failed to perform the duties of his office, or that he has engaged in conduct prejudicial to the proper administration of justice, it shall censure him or shall remove him from office." Virginia Const. of 1971, art. VI, § 10.

If the decision of the Supreme Court of Virginia is thought by the judge to offend the Constitution of the United States, the judge may appeal to the Supreme Court of the United States. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *see also Edmonds v. Clarkson*, 996 F.Supp. 541 (E.D.Va.1998).

## JEAC Formal Opinion No. 99–6 And The Plaintiffs' Action

On November 15, 1999, JEAC issued Formal Opinion No. 99–6 ("Opinion No. 99–6") which responds to the question: "Is it proper for a judge to vote in a primary election?" Opinion No. 99–6 answered that query in the negative. The opinion begins with a quotation from Alexis de Tocqueville who, upon his return to France from a visit to America, remarked: "If I were asked where I place the American aristocracy, I should reply without hesitation ... that it occupies the judicial bench and bar." Setting forth, then, from the point of departure that the public respect which American judges rightly enjoy is of utmost importance to the American judicial system, the opinion traces that respect, in part, to the "apolitical nature of Virginia's judiciary." Form. Op. No. 99–6. Because, in its view, voting in a primary could potentially be perceived by "reasonable people" as a partisan activity likely to interfere with the judge's impartiality, the JEAC concluded that, when judges vote in primaries, they violate Canon 2, which seeks to promote public confidence in the impartiality of the judiciary, and Canon 5, which requires that "a judge shall refrain from political activity inappropriate to the judicial office."

Desirous of participating in forthcoming primary elections without fear of violating the Canons, Plaintiffs Lisa B. Kemler and James C. Clark, substitute judges serving terms in the General District Court of the 18th Judicial Circuit of Virginia, requested reconsideration of the opinion pursuant to the reconsideration protocol included in the January 5 Order. By Opinion No. 00–1, dated February 1, 2000, JEAC affirmed Opinion No. 99–6 without discussion.

Plaintiffs contend that, given the publication of Opinion No. 99–6, for a judge to vote in a primary election would amount to a willful and knowing act specifically identified as unethical by the agency of the Supreme Court of Virginia charged with rendering opinions on such issues. That putatively unethical act would subject the actor to investigation and possible adverse action by the JIRC, including the filing of a complaint with the Supreme Court of Virginia, which, in turn, could lead to serious sanction or impeachment. Plaintiffs also assert that, in any event, they risk public approbation and damage to their professional and public reputations if they exercise their constitutional right to vote in Virginia's primary elections.

Concerned not to violate the standard respecting voting in primary elections, Plaintiffs have refrained from voting in primary elections or caucuses pending adjudication of this action. The Complaint seeks declaratory and injunctive relief, and claims that Opinion No. 99–6, issued by the JEAC and enforceable by the JIRC and the Supreme Court of Virginia, chills their right to participate in the electoral process, and thereby violates the First and Fourteenth Amendments to the Constitution of the United States.

## DISCUSSION

Defendants motion to dismiss challenges the justiciability of the dispute presented in the Complaint, and, alternatively, requests the Court to abstain from adjudicating the dispute under the doctrine announced in *Burford v. Sun Oil Co.*, 319

U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

## I. Issues Of Justiciability

Justiciability implicates not only the standing of litigants to assert particular claims, but also the appropriate timing of judicial intervention in the dispute presented by the claim. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 136–48, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). These two concepts also are analyzed often under the rubrics of standing and ripeness, respectively.

### A. Standing

The minimum requirements for individual standing were explicated by the Supreme Court of the United States in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), wherein the Court made quite clear that:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to [1] "show that *he personally has suffered some actual or threatened injury* as a *result* of the putatively *illegal conduct* of the defendant," ... *and* that [2] the *injury "fairly can be traced* to the challenged action" and [3] "is likely to be redressed by a favorable decision...."

*Id.* (citations omitted) (emphasis added); *see also Natural Resources Defense Council, Inc. v. Watkins,* 954 F.2d 974, 978 (4th Cir.1992). The requirement that a plaintiff suffer "actual injury redressable by the court ... tends to assure that the legal questions presented to the court will be resolved, not in the ratified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge,* 454 U.S. at 472, 102 S.Ct. 752 (internal citations omitted). The Plaintiffs' claims must be measured against these standing requirements.

### 1. Injury–In–Fact

The first element of standing requires that a plaintiff have suffered an "injury in fact"—that is, an invasion of a legally protected interest which is (a) concrete and particularized, see *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton,* 405 U.S. 727, 740–741, n. 16, 92 S.Ct. 1361, 31 L.Ed.2d 636, (1972); and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (*quoting Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Thus, the complainant must allege an injury to himself that is "distinct and palpable," *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343, as opposed to merely "[a]bstract," *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). The litigant must clearly and specifically set forth facts sufficient to satisfy these Article III standing requirements, and a federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing. *See Whitmore,* 495 U.S. at 155, 110 S.Ct. 1717.

In *O'Shea v. Littleton, supra,* the Supreme Court held that there was no case or controversy where residents of an Illinois town sought injunctive relief against a magistrate and a circuit court judge whom the plaintiffs claimed were engaged in a pattern and practice of illegal bondsetting, sentencing, and jury-fee practices in criminal cases. The Court summarized the claim to be "that if respondents proceed to violate an unchallenged law and if they are charged, held to answer, and tried in any proceedings before petitioners, they will be subjected to the discriminatory practices that petitioners are alleged to have followed." *Id.* at 497, 94 S.Ct. 669. Thereupon, because it considered the plaintiff's claim to have drifted "into the area of speculation and conjecture," the Court

held that there was no cognizable injury-in-fact and hence no case or controversy upon which jurisdiction could stand.

The same principles have been applied to foreclose the exercise of federal jurisdiction in the face of injury apprehended upon future contingencies. For example, there was no standing where the plaintiff feared that, in a future encounter with police, the officers might administer an allegedly illegal "chokehol[d]," *Los Angeles v. Lyons*, 461 U.S. at 105, 103 S.Ct. 1660; where the prospective future candidacy of a former Congressman was involved, *Golden v. Zwickler*, 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); and where it was apprehended that the police might use deadly force against a person fleeing from an as yet unaffected arrest, *Ashcroft v. Mattis*, 431 U.S. 171, 172, n. 2, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977). Similarly, in *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), the Supreme Court rejected a physician's attempt to defend a state law restricting abortions, because his complaint that fewer abortions would lead to more paying patients was "'unadorned speculation'" insufficient to invoke the federal judicial power. *Id.* at 66, 106 S.Ct. 1697 (*quoting Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 44, 96 S.Ct. 1917).

In the decision urged as most applicable by the Defendants, *Renne v. Geary*, 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991), the Supreme Court considered a First Amendment claim asserted by voters, party central committees and committee members challenging a California constitutional provision which prohibited political parties from endorsing candidates for nonpartisan office. The Court held that the claim was nonjusticiable after concluding that the plaintiffs "desire to endorse, support, and oppose candidates [publicly and in print]," coupled with the voters "desire to read [such] endorsements," was opposed by "no factual record of an actual or imminent application of [the challenged California statute] suffi-

cient to present the constitutional issues in 'clean-cut and concrete form.'" *Id.* at 321–22, 111 S.Ct. 2331. Nor did the record disclose "evidence of a credible threat that [the statute] will be enforced...." *Id.* at 322, 111 S.Ct. 2331. In short, the plaintiffs had "failed to demonstrate a live dispute involving the actual or threatened application of [the statute] to bar speech." *Id.* at 320, 111 S.Ct. 2331.

Individually and collectively, those decisions teach that allegations of possible future injury only rarely will satisfy the standing requirements of Article III. *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (*quoting Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 67 L.Ed. 1117 (1923)). Standing requirements, however, often have been relaxed where, as here, they arise in the context of First Amendment claims because of the unique nature of the amendment, the importance of the rights it secures, and the special body of jurisprudence interpreting it. The rationale for relaxing the standing requirements in the First Amendment context has been stated by the Supreme Court as follows:

> Within the context of the First Amendment, the Court has enunciated other concerns that justify a lessening of prudential limitations on standing. Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

*Secretary of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). Thus, over the years the Supreme Court

536

has held that constitutional violations may arise from the deterrent, or "chilling," effect of governmental regulations which fall short of a direct prohibition against the exercise of First Amendment rights, but which nonetheless impinge on those rights in an indirect fashion. *See Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

For instance, in *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), the Court found standing where private individuals were required to make special written requests to the Post Office for delivery of mail containing "communist political propaganda." Similarly, in *Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971), the Court recognized the standing of an applicant to a State bar who was denied admission for her refusal to answer a question about the organizations to which she belonged. And, in *Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), the Court considered a requirement that prospective employees of a government agency take a particular oath of "indefinite language," holding that the First Amendment may not be inhibited in that way. Equally clear, however, is that:

> [i]n none of these cases ... did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruit of those activities, the agency might in the future take some other and additional action detrimental to that individual. Rather, in each of these cases, the challenged exercise of governmental power was *regulatory, proscriptive, or compulsory in nature,* and the complainant was either *presently or prospectively subject to the regulations, proscriptions, or compulsions* that he was challenging.

*Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (emphasis added). In *Laird,* the Court emphasized

that these important limitations on standing remain operative even in the context of a First Amendment claim. In *Laird,* the complainants alleged a chill on the exercise of their constitutional rights by the Department of the Army's gathering of intelligence information related to the complainants' participation in civil demonstrations. The Court held that the complainants' fear that the Army might someday use this lawfully-gathered information to round up participants in civil demonstrations did not constitute an injury, and reaffirmed the rule that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm...." *Id.* at 13–14, 92 S.Ct. 2318 (*quoting United Public Workers of America (C.I.O.) v. Mitchell,* 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947)). Thus, the decisions which have relaxed the standing requirement for claims implicating the First Amendment have "in no way eroded the established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as a result of the action...." *Id.* at 13, 92 S.Ct. 2318 (*quoting Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937)).

A more recent decision, *Meese v. Keene,* 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987), teaches that, where indirect interference with First Amendment rights is alleged, the plaintiff must put forward proof of a "distinct and palpable" injury. In *Keene,* a United States citizen who wished to exhibit three specific Canadian films challenged the constitutionality of the Foreign Agents Registration Act, under which those three films had been classified as "political propaganda" and thus were made subject to the Act's registration, filing, and disclosure requirements. Plaintiff, an attorney and member of the California State Senate, alleged that the statutory classification deterred him from

exhibiting the films out of a fear that his professional reputation would suffer adversely were it known that he was engaged in the dissemination of "political propaganda." The Court noted that "[i]f Keene had merely alleged that the appellation deterred him by exercising a chilling effect on the exercise of his First Amendment rights, he would not have standing to seek its invalidation." *Id.* at 473, 107 S.Ct. 1862.

Keene, however, further had alleged that "his personal, political, and professional reputation would suffer and his ability to obtain re-election and to practice his profession would be impaired." To support this claim of imminent injury, Keene offered uncontradicted affidavits, one of which described the results of a Gallup opinion poll purporting to show that a candidate's screening of three films dubbed "political propaganda" would cause 49.1% of the poll's respondents to be less inclined to vote for him. Another affidavit, from an experienced political analyst, opined that the screening would "substantially harm his chance for reelection and would adversely effect his reputation in the community." *Id.* at 474, 107 S.Ct. 1862. Thus, *Keene* reaffirms the rule that standing, even in the First Amendment arena, requires "a claim of specific present objective harm or a threat of specific future harm." *Laird,* 408 U.S. at 14, 92 S.Ct. 2318.

■ In the present case, Plaintiffs have not established that they face an actual or imminent injury. Rather, the Complaint alleges that the Plaintiffs are desirous of taking certain action—*i.e.,* voting in the primary election—but wish not to risk what they anticipate might be the consequences of that action. Plaintiffs describe their injury as the "compelled non-participation in the processes of democratic government," and claim to find themselves "between the Scylla of intentionally flouting [a stated ethical rule] and the Charybdis of forgoing what [they] believe to be constitutionally protected activity in order to avoid becoming enmeshed in [presumptively unethical behavior]." Plaintiffs' Mem. in Opp. at 6 (*citing Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)).

*Steffel* and its progeny are not helpful to the Plaintiffs on the claims which they assert. In *Steffel,* a plaintiff appealed the denial of declaratory relief in an action brought under the First and Fourteenth Amendments, in which the Complaint alleged that the police had twice threatened to arrest the plaintiff for distributing anti-Vietnam War handbills on the sidewalk of a Georgia shopping center. Recognizing that its decisions in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), made clear that "unless bad-faith enforcement or other special circumstances are demonstrated, principles of equity, comity, and federalism preclude issuance of a federal injunction restraining enforcement of the criminal statute and, in all but unusual circumstances, a declaratory judgment upon the constitutionality of the statute." *Steffel,* 415 U.S. at 454, 94 S.Ct. 1209. *Steffel* then answered the question left open by *Samuels,* that is, absent a showing of bad-faith enforcement or other special circumstance, is federal declaratory relief precluded under principles of equity, comity, and federalism where a state prosecution is threatened but not yet pending? In *Steffel,* the Supreme Court held that declaratory relief was not precluded in such circumstances.

It was significant to the Court's finding of an actual controversy that the plaintiff had been "twice warned to stop handbilling," 415 U.S. at 459, 94 S.Ct. 1209, and threatened with prosecution by the police; indeed, the parties there stipulated that, if plaintiff had thrice violated the police order to stop, a warrant would have issued, and it was conceded by counsel for the police officers that arrests would have followed. *See* 415 U.S. at 455–56 & n. 4, 94 S.Ct. 1209. Thus, remarked the Court, "pe-

titioner has alleged threats of prosecution that cannot be characterized as 'imaginary or speculative,'" and his "concern with arrest has not been 'chimerical.'" *Id.* at 459, 94 S.Ct. 1209. "In these circumstances," the Court held, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Id.*

Plaintiffs' circumstance is readily distinguished from Steffel's. Most obviously, Plaintiffs are not challenging a criminal statute, as was Steffel. In fact, Plaintiffs here have not adequately established that the state administrative structure which they seek to enjoin compels them to do, or to refrain from doing, anything. They acknowledge that JEAC issues only "advisory opinions concerning the compliance of proposed future conduct with the Canons of Judicial Conduct"; and they admit that JEAC opinions are not binding on the JIRC, the judges, or the Supreme Court of Virginia. Because JEAC is without authority to initiate disciplinary action based upon the opinions it issues, Opinion No. 99–6, standing alone, poses no actual or threatened injury to Plaintiffs.

Plaintiffs similarly have failed to show that the JIRC has threatened imminent enforcement of Opinion No. 99–6. In fact, they overlook the multitude of contingencies upon which their theory of injury depends. The Defendants argue that the Court cannot be sure, for instance, that Plaintiffs' vote in a primary would even be detected by a person (1) with knowledge of Opinion No. 99–6, who is (2) in a position to levy a charge against Kemler for her act of voting in a primary. That is true, but judges, of all people, should not take actions they think are inappropriate merely on the premise that the act will go undetected. Therefore, it will be assumed that those contingencies are met.

Even so, it remains uncertain whether (3) JIRC counsel would present the charge to the JIRC as an inquiry, see Rule 3(A)(4) of the JIRC, at which point the JIRC could (4) dismiss the charge as lacking merit, see Rule 3(A)(6), or (5) proceed with a formal hearing, see Rule 3(B)(2). In this context, the record is unclear as to whether the JIRC is (6) empowered to "nullify" the advice contained in an advisory ethical opinion on First Amendment grounds, and whether the JIRC would ultimately (7) refer a complaint to the Supreme Court of Virginia. If a complaint is so referred, then it is equally unsettled (8) what conclusion might be reached in a proceeding before that Court, much less (9) what potential disciplinary action might flow therefrom.

Plaintiffs seek to sidestep these manifold contingencies, arguing, essentially, that some injury would attach automatically upon voting in a primary by virtue of a Virginia judge's ethical obligation as construed by Opinion No. 99–6. This argument turns, perhaps too narrowly, on a finding that judge's are somehow "different," "[a]lone among regulated professionals," and that their obligation to avoid "even the appearance of impropriety" exempts them from the burden of the "ordinary citizen" to suffer concrete injury in the manner required by Article III's "case or controversy" clause before they are entitled to redress in the federal courts. Put another way, the fact that judges occupy positions which require them to avoid the appearance of impropriety (an obligation shared by members of the bar at large) does not change the standing precepts established by the Supreme Court.

Plaintiffs' showing of injury is also deficient in light of *Keene, supra,* wherein the plaintiff alleged more than a subjective chill of his First Amendment rights. Keene established, by affidavits which were uncontradicted, that real injury to his professional reputation and chances for re-election would flow from his screening of films branded "political propaganda." Here, Plaintiffs offer only the public statement of Chief Judge F. Bruce Bach of the Fairfax County Circuit Court to the effect

that he will no longer vote in primaries because "[i]t's certainly not important enough to me to run a risk of being in violation of the canons of ethics." Chief Judge Bach's statement refers to the subjective chill, but not the concrete injury to be suffered thereby. Thus, because Plaintiffs, rather than establishing a concrete, imminent injury, have "merely alleged that [Opinion No. 99–6] deterred [them] by exercising a chilling effect on [their] First Amendment rights," they do "not have standing to seek its invalidation." *Keene,* 481 U.S. at 473, 107 S.Ct. 1862. Accordingly, Plaintiffs' burden to show injury-in-fact has not been met.

**2. Injury Traceable to Defendant's Action**

The requirement that an injury be traceable to the Defendant's actions is equally problematic for Plaintiffs. The difficulty in showing causation derives in part from the bipartite administrative structure in which Plaintiffs identify the named Defendants. For instance, assuming the Plaintiffs were able to show some impending, concrete injury satisfying the requisites of Article III (which they have not), would that injury be traceable to (1) the JEAC's issuance of what is clearly an non-binding advisory opinion?, or (2) the JIRC's actual enforcement of a hypothetical violation of the advice rendered by that advisory opinion, or (3) some combination of these two actions.

None of the parties have addressed the Article III causation issue, but the Defendant-committee members of the JEAC presumably would argue that, because their opinion is non-binding, they cannot be held accountable for action taken by the JIRC. Defendant-committee members of the JIRC, meanwhile, could be expected to argue that they merely "investigate charges which would form the basis for retirement, censure, or removal of a judge," but are unauthorized to take actual disciplinary action against a judge who has been so charged. Rather, the most severe action authorized to be taken by the JIRC is the referral of a complaint to the Supreme Court of Virginia. Again, the causation analysis is complicated by Plaintiffs' weak showing of injury-in-fact, and foreshadows the ripeness problems addressed *infra.*

**3. Injury Redressable**

If the many contingencies set forth above were met so that Plaintiffs were in fact disciplined by the Supreme Court of Virginia for their participation in a primary election, then Plaintiffs' injury would be redressable by a finding that their First Amendment rights were violated by such discipline. The conclusion that the Plaintiffs would be disciplined, however, is attenuated to the point of speculation by those various contingencies.

More importantly, in the proceedings before the JIRC or the Supreme Court of Virginia, the Plaintiffs could present their First Amendment claims as defenses. And, if the JIRC and Virginia's highest court both were to reject those defenses, the constitutional issues would be reviewable by the Supreme Court of the United States. *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

In sum, the record here involves the exercise of no governmental restriction of speech that is "regulatory, preemptive, or compulsory in nature," *Laird v. Tatum,* 408 U.S. at 11, 92 S.Ct. 2318, and the prospect of actual enforcement of Opinion No. 99–6 is so attenuated by intervening contingencies that the injury-in-fact requirement necessary to support standing is not satisfied.

**B. Ripeness**

█ Defendants argue that Plaintiffs seek resolution of an abstract dispute before any Virginia agency or court has had the opportunity to consider the issues

raised in the Complaint and, indeed, before any Virginia agency has taken any action adverse to Plaintiffs or to any other judge. Thus, they contend that the issue is not ripe for adjudication.

■ For a case or controversy to be ripe for judicial review, it must involve "an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties." *Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203, 208 (4th Cir.1992) (*citing Pacific Gas & Elec. v. State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190, 200, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)). This description and others attempt to articulate the holding of the seminal case on this point, *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). *Abbott* requires that two questions be asked: (1) are the issues fit for judicial review; and (2) will hardship fall to the parties upon withholding court consideration of the issues? *Id.* at 149, 87 S.Ct. 1507. Each question is examined in turn.

### 1. Fitness

■ The Fourth Circuit has clarified the first facet of the *Abbott* test: "A case is fit for judicial decision where the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings." *Charter Federal,* 976 F.2d at 208 (*citing Abbott,* 387 U.S. at 149, 87 S.Ct. 1507). Thus, a claim is unripe when critical elements are contingent or unknown. *See Marusic Liquors, Inc. v. Daley,* 55 F.3d 258, 261 (7th Cir.1995).

■ The question of an issue's fitness for judicial decision in turn has two parts: (1) "the agency's interest in crystallizing its policy before that policy is subject to review"; and (2) "the court's interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Regional Management Corp., Inc. v. Legal Serv's Corp.,* 186 F.3d 457, 465 (4th Cir. 1999) (*citing City of Houston v. Department of Housing and Urban Dev.,* 24 F.3d 1421, 1430–31 (D.C.Cir.1994) (internal quotation marks omitted). A court must balance these two interests against the hardship to the plaintiff from withholding court consideration at a given time. *See id.*

Examples of the ripeness doctrine from Fourth Circuit case law help to elucidate the *Abbott* analysis. For instance, in *Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203 (4th Cir.1992), a financial institution sought a ruling from the FDIC as to the enforceability of a contract before the FDIC had even threatened any action against the institution. The Fourth Circuit found that "several contingencies separate[d] Charter from a threat of final agency action in this case," and, therefore, held that "the tentative nature of the FDIC's involvement renders Charter's claims not ripe as to the FDIC." *Id.* at 209. Similarly, in *Appalachian Energy Group v. Environmental Protection Agency,* 33 F.3d 319 (4th Cir.1994), the Fourth Circuit found that judicial review was not proper for a challenge to an internal EPA memorandum discussing a proposed new permitting system.

In *Arch Mineral Corporation v. Babbitt,* 104 F.3d 660 (4th Cir.1997), the Fourth Circuit adopted a formulation used in the First Circuit which is helpful in this context:

[A controversy is] sufficiently particularized ... [and] final ... [if it is] at least a firm (and perhaps binding) adoption of a position by the agency with regard to a course of conduct on the part of a member of the regulated industry which does not require further administrative action other than the possible imposition of sanctions.

*Id.* at 668 (*quoting Northeast Airlines, Inc. v. CAB,* 345 F.2d 662, 664 (1st Cir. 1965)). In *Northeast Airlines,* the Civil

Aeronautics Board had taken final action when it issued an order setting forth its "interpretation of the [Federal Aviation] Act as applied to the specific facts alleged by Northeast in its petition." *Id.* at 664. OSM's presumption of ownership and control, coupled with the fact that Arch had no further evidence with which to rebut the presumption, constituted a "firm (and perhaps binding) adoption of a position by the agency." Further, if the presumption could not be challenged by new evidence from Arch, the only step left was the imposition of the sanction.

In *Roosevelt Campobello International Park v. United States EPA*, 684 F.2d 1034 (1st Cir.1982), also cited with approval by the Fourth Circuit in *Arch Mineral*, the First Circuit restated the rule of *Northeast* in the converse, holding that an agency action was not final "if it makes no change in the status quo itself, but requires 'further administrative action other than the possible imposition of sanctions' before rights, obligations or duties arise." *Id.* at 1040.

Defendants argue that the unripeness of Plaintiff's action is revealed by the fact that the act of voting in primaries raises distinct and varying ethical concerns depending on the circumstances surrounding the particular vote. Thus, one judge may "quietly vote in a primary and argue that no political statement is made by that action," while another judge's participation in a primary may be attended by fanfare, public statements, and media attention. Yet another judge might continue to publicly demonstrate his support for a particular party at the state and national levels. Defendants assert that, for this Court to rule on the issues raised by the Complaint would be "to render an advisory opinion, to theorize in a fact-less vacuum, as to the constitutionality of the Opinion." Def. Mem. at 10. A second wrinkle of fact argued by Defendants concerns the pledge which participants in recent primaries have been asked to sign, stating their obligation to abstain from participating in the primaries of other parties. Other primaries, they contend, require different pledges, and this variable fact should be ascertained before a court rules on the claims set forth in the Complaint.

Both arguments offer a superficial appeal but each is illusory because the challenged JEAC opinion prohibits all primary voting without regard to circumstances of the appearances attendant upon a particular judge's voting conduct. Hence, the ripeness determination cannot be based on that approach.

A third observation supporting the conclusion that Plaintiff's claims are not ripe concerns the procedural flexibility of the JIRC investigatory process. Because the JIRC undertakes an "incremental process,"—in which it may terminate the inquiry at any stage of review, or may engage in more informal discussions to resolve a complaint, or may find it is without jurisdiction—to adjudicate the issue now would necessitate speculation about whether there would ever be any issue to decide. In other words, the case is not "sufficiently particularized" and requires "further administrative action other than the possible imposition of sanctions," *Arch Mineral*, 104 F.3d at 668. Linking this observation to the rule in *Regional Management Corp.*, 186 F.3d at 465, the "agency" can be said to have a significant "interest in crystallizing its policy before that policy is subject to review. . . ."

Nor is "the agency rule or action giving rise to the controversy . . . final and not dependent upon future uncertainties or intervening agency rulings." *Charter Federal*, 976 F.2d at 208 (*citing Abbott*, 387 U.S. at 149, 87 S.Ct. 1507). As discussed, discipline of the Plaintiffs by the Supreme Court of Virginia is dependent upon numerous contingencies.

Finally, it is required that this Court acknowledge its own "interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Regional Management Corp., Inc. v. Legal Serv's*

*Corp.,* 186 F.3d 457, 465 (4th Cir.1999). Further development of the matter at the JIRC and the Supreme Court of Virginia serves this end.

When these principles are applied to the facts here, it seems rather clear that the issues are not yet fit for judicial review. No concrete effect can be felt by the Plaintiffs unless the JIRC and the Supreme Court of Virginia enforce JEAC Opinion No. 99-6. Thus, although the question here is a purely legal one, the opinion can have no effect without future rulings by the JIRC and the Supreme Court of Virginia. There is no reason to believe that the JIRC or the Supreme Court of Virginia would apply Opinion No. 99-6 to restrict the rights of, or to impose sanctions on, the Commonwealth's judges without first assessing all First Amendment implications of such a course of action. And, those entities no doubt will consider Opinion No. 99-6 in perspective of the fact that judges in no other state or in the federal system are subject to strictures of the type which the JEAC thinks are applicable to Virginia's judges. Certainly, the JIRC and the Supreme Court of Virginia ought to be afforded the opportunity to crystallize their policy in this important matter, which is perhaps unique among all state interests.

### 2. Hardship

"[T]he purpose of the 'hardship to the parties' analysis is to ascertain if the harm that deferring review will cause the petitioner[ ] outweighs the benefits it will bring the agency and the court." *West Virginia Highlands Conservancy, Inc. v. Babbitt,* 161 F.3d 797, 801 (4th Cir.1998) (*quoting Eagle–Picher Indus., Inc. v. EPA,* 759 F.2d 905, 918 (D.C.Cir.1985)). For "deferral to be outweighed, postponing review must impose a hardship on the [plaintiff] that is immediate, direct, and significant." *Id.* at 800 (*quoting State Farm Mut. Auto. Ins. Co. v. Dole,* 802 F.2d 474, 480 (D.C.Cir.1986). "Whether [the plaintiff's] charges are sufficiently ser-

ious under the 'hardship to the parties' criterion to warrant immediate review depends upon [the] totality of the circumstances." *Id.* at 801 (*quoting Atlantic Richfield Co. v. DOE,* 769 F.2d 771, 783 (D.C.Cir.1984) (quotations omitted; second alteration in original)). Also important in the context of this action is that, although the threat of criminal penalty militates in favor of a finding of hardship, see *Navegar, Inc. v. United States,* 103 F.3d 994, 999–1002 (D.C.Cir.1997), threat of civil enforcement is considered a hardship that generally does not call for judicial intervention. *See Lee v. Oregon,* 107 F.3d 1382, 1391–92 (9th Cir.), *cert. denied,* 522 U.S. 927, 118 S.Ct. 328, 139 L.Ed.2d 254 (1997).

Plaintiffs assert that their reluctance to vote in primary elections for fear of adverse consequences stemming from the potential enforcement of Opinion No. 99-6 constitutes a hardship, and, further, that they will continue to suffer this hardship so long as this Court defers adjudication of the claims raised in their complaint. More particularly, Plaintiffs characterize their hardship as the "compelled non-participation in the processes of democratic government." Pl.'s Opp'n at 6. In support of their allegation of hardship, Plaintiffs aver that they themselves have refrained from voting in primaries, and that Chief Judge F. Bruce Bach of the Fairfax County Circuit Court has publicly stated that he will refrain from voting in future primaries.

The right to vote is among the most important benefits of citizenship. And, contrary to the defendants' assertion, the right to vote is neither less precious, nor less entitled to protection, because it is cast in a primary election, rather than a general election. In fact, at least in Virginia, the primary election often is the election which determines who actually will serve as representatives of the electorate in both the state and federal governments. Thus, a restriction on voting in a primary election presents a deprivation just as great as does a restriction on voting in a general election.

Nothing in Opinion No. 99–6 actually prohibits a judge from voting in a primary election. Rather, the effect of Opinion 99–6 is to define as unethical conduct the exercise of the right. And, unethical conduct by a judge exposes the judge to several serious consequences, including loss of professional and personal respect and reputation, censure, removal from office or denial of reappointment. Plaintiffs are exposed to these sanctions if, as Opinion No. 99–6 articulates, voting in a primary is unethical conduct and if Plaintiffs vote in a primary. However, those consequences can be imposed only if, after an investigation in which the judges may be heard, the JIRC refers charges and the Supreme Court of Virginia, after affording the judges a hearing, finds that Opinion No. 99–6 is correct.

Whatever hardship may result from deferring judicial review is speculative. Moreover, the significance of that hardship is lessened considerably by the fact that the Plaintiffs face neither criminal nor civil penalty by virtue of the possible enforcement of Opinion No. 99–6. In fact, they face administrative scrutiny before the JIRC and possible professional sanction by the Supreme Court of Virginia only if the many contingencies discussed in Part I.A.1, *supra,* come to pass. Accordingly, this Court is currently without a "clean-cut and concrete" record on which to analyze Plaintiffs' claims. In sum, the claims are not ripe because they pass neither the fitness nor hardship prongs of the ripeness analysis.[2]

## CONCLUSION

For the foregoing reasons, Plaintiffs' action is non-justiciable, and therefore Defendants' Motion to Dismiss is GRANTED and this action is dismissed without prejudice.

2. This Court having no jurisdiction to hear the action, it is unnecessary to address Defen-

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

dants' argument that the Court abstain.